Betty J. ARCHIE, et al.,
Plaintiffs–Appellants,

v.

CITY OF RACINE, Ronald W. Chiapete,
and George W. Giese,
Defendants–Appellees.

No. 86–1783.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 27, 1986.

Decided July 14, 1987.

Reargued En Banc Feb. 23, 1988.

Decided May 23, 1988.

Curry First, Perry, First, Lerner, Quindel & Kuhn, S.C., Milwaukee, Wis., Adrian Schoone, Schoone, Hankel, Ware & Fortune, S.C., Racine, Wis., for plaintiffs-appellants.

Joseph E. Boyle, Office of City Atty., Racine, Wis., for defendants-appellees.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

The Bill of Rights limits the power of government. It insists that the government refrain from acting in certain spheres. Yet it is possible to restate most actions as corresponding inactions with the same effect, and to show that inaction may have the same effects as a forbidden action. So, for example, the Supreme Court has implied from the First Amendment "rights of access" to some information held by the government, reasoning that the right to speak implies a right to know, and that the government would be forbidden to suppress publication of the information if it were in private hands. E.g., *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); cf. *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978).

Implication of a "positive" right (to have the government do something) out of the constitutional "negative" right (to be let alone) often depends on arguments about policy rather than on the text, structure, or history of the document; it may depend on seeing things from the perspective of collective benefits rather than the autonomy of the individual, a perspective that potentially increases the role of government in society, contrary to the plan of the Bill of Rights. Such a step therefore must be unusual and exceptionally well-justified.

Today's case presents a claim for the "positive" right of effective rescue services. It is the public version of the doctrine in tort law that no one is required to rescue another in distress, but that if he begins a rescue he had better not be negligent. **Restatement (2d) of Torts** §§ 314, 323 (1965); Prosser & Keeton, **The Law of Torts** 378–82 (5th ed. 1984). The rule that no one need volunteer respects the autonomy of bystanders (and reduces the risk that one will be conscripted into a hazardous rescue); the rule that a volunteer must act competently reflects the belief that a rescue in process may lead superior rescuers to pass by, making the victim worse off

than he would have been had the first rescuer not chanced on the scene. A simple application of this rule to governmental rescue services—the police, fire departments, child welfare agencies, "hot line" phone numbers, etc.—would mean that the government need not offer such services but must provide them competently if it does. Yet the Constitution does not incorporate all tort law. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Perry v. FBI*, 781 F.2d 1294 (7th Cir.1986) (en banc). We must decide today how far the constitutional rule departs from the common law rule and, if they differ, whether there is an independent constitutional obligation to provide efficacious rescue services.

I

At 7:19 a.m. on May 27, 1984, Les Hiles called the fire department of Racine, Wisconsin, to request a rescue squad for his friend Rena DeLacy. Hiles told George Giese, the dispatcher, that DeLacy was "hyperventilating" and could "hardly breathe". 627 F.Supp. 766, 767 (E.D.Wis. 1986) (the district court's opinion contains a transcript of the dialogue). Hiles said that DeLacy needed medical care but could not walk to the hospital five blocks away. Giese inquired about DeLacy's age (43) and called her to the phone. She was breathing heavily. After DeLacy said that she had had a breathing problem "once" before, Giese told her to breathe into a paper bag until she calmed down. A first aid book recommends this for hyperventilation.[1]

The advice did not work. At 3:03 p.m. Hiles called again, and Giese said: "Well, if she's hyperventilating, just, just have her do what I told you to do. She's going to have to breathe into that bag." 627 F.Supp. at 768. Hiles worried that DeLacy's heavy breathing would "wear her heart out"; Giese assured him that it

---

1. Johnson & Johnson, **First Aid Book** 66–67 (reprinted by the district court, 627 F.Supp. at 770 n. 1).

would not. Hiles thanked Giese and hung up. Giese was right about the heart, but this was not DeLacy's problem. She died at home late that evening from respiratory failure, brought on by emphysema and pneumonia. A physician testified that emergency administration of oxygen, followed by other appropriate care, could have saved DeLacy's life.

The administrator of DeLacy's estate and her five living children sued Giese, the City, and its fire chief under 42 U.S.C. § 1983, contending that Giese's failure to send an emergency squad violated the Equal Protection and Due Process Clauses of the fourteenth amendment. The plaintiffs' principal argument at the bench trial was that DeLacy's race (black) accounted for Giese's neglect. The district court found that Giese regularly sent rescue squads to help black persons, 627 F.Supp. at 770, and that DeLacy's race did not play a role in Giese's decision. This finding is not clearly erroneous. *Pullman–Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).

The elimination of racial explanations left as a puzzle Giese's unwillingness to dispatch a rescue team—the only time he had declined to send help in his four years as a dispatcher. Giese testified that he did not think that DeLacy needed help urgently (perhaps because she denied having chronic breathing problems, though Giese did not spell this out) and also took into account Hiles's reputation, calling him a "jerk". The district court accepted Giese's description of his reasons but did not think much of them:

I find absurd Giese's apparent belief that his refusal to send the rescue squad can

somehow be justified because Hiles was the one who asked for it. It is undisputed that Hiles has a reputation in Racine: he was in the County Jail at the time of the trial; he drinks; he is described as an iconoclast, a character; ... Nevertheless, on the tapes he is lucid; it is clear what he wants; his voice reflects the urgency of the situation. At trial he was articulate and perfectly capable, in my view, of judging when an emergency would exist, and also perfectly capable of describing it.

627 F.Supp. at 770–71. Moreover, the district court observed, the City's policy is to send a rescue squad to every emergency, and Fire Chief Chiapete had issued a press release stating that Giese exercised poor judgment. *Id.* at 769. Chiapete and one of his subordinates repeated that view in testimony at trial. The district court therefore characterized Giese's "conduct [as] stupid, or more charitably just poor judgment". *Id.* at 771.

▮▮▮ That finding led the district court to enter judgment for the defendants. The court first concluded that Chiapete was not responsible for Giese's errors, so he had to be dismissed. 627 F.Supp. at 771. The City, which is not vicariously responsible for the acts of its employees and could be responsible only for its policies and the decisions of its policy makers, also received judgment.[2]

Only Giese remained as a defendant. Relying on a series of cases in this circuit— *Ellsworth v. City of Racine,* 774 F.2d 182, 185 (7th Cir.1985); *Jackson v. Byrne,* 738 F.2d 1443, 1446 (7th Cir.1984); *Jackson v. City of Joliet,* 715 F.2d 1200, 1203–04 (7th

---

2. See *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The plaintiffs intimate that Giese was the City's policy maker in this case because he decided on the City's behalf not to assist DeLacy. This approach—which would establish *respondeat superior* for municipalities in all but name, was rejected in *St. Louis v. Praprotnik,* — U.S. ——, 108 S.Ct. 915, 924–25, 99 L.Ed.2d 107 (plurality opinion), 108 S.Ct. at 932–33 (separate opinion) (1988). The city also cannot be responsible on the basis of a "policy" or "custom" of neglecting its residents who need emergency help; the district court found that

the City has the opposite policy, which Giese did not follow. Plaintiffs' contention that the City has a "policy" of training its dispatchers inadequately is answered by the fact that Giese received 30 hours' training as a dispatcher and performed that job without incident for four years before Hiles's call. It is unnecessary for us to decide whether a lack of training, or toleration of an employee with a history of poor judgment, may be the basis of liability. See *Harris v. City of Canton,* 725 F.2d 371 (6th Cir.1984), *cert. granted,* — U.S. ——, 108 S.Ct. 1105, 99 L.Ed.2d 267 (1988). We therefore affirm the district court's judgment for the City.

Cir.1983)—the district court concluded that failure to rescue a person in distress does not violate the Due Process Clause. 627 F.Supp. at 771–73. See also, e.g., *Donald v. Polk County*, 836 F.2d 376, 383–84 (7th Cir.1988); *DeShaney v. Winnebago County Dep't of Social Services*, 812 F.2d 298, 301–04 (7th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1218, 99 L.Ed.2d 419 (1988); *Walker v. Rowe*, 791 F.2d 507, 509–12 (7th Cir.1986); *Hinman v. Lincoln Towing Service, Inc.*, 771 F.2d 189, 194 (7th Cir.1985); *Beard v. O'Neal*, 728 F.2d 894, 898–900 (7th Cir.1984); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982). The government need not provide services, and these cases hold that if it does provide services it need not provide them competently. The district court allowed that the government must assist prisoners and others with whom it has some "special relationship" but concluded that "Rena DeLacy, personally, has no greater claim to a special relationship with Racine than do all other citizens of the city." 627 F.Supp. at 772.

A panel of this court reinstated the claim against Giese, 826 F.2d 480. We vacated that decision and set the case for rehearing en banc to consider the extent of a government's obligation to provide rescue services. We address three possibilities: that a violation of state law amounts to an unconstitutional "abuse of power"; that grossly negligent rescue operations violate the Constitution; and that the Constitution of its own force requires a state to supply effective rescue services.

## II

■ The Due Process Clause provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law". Giese did not deprive DeLacy of her life. Emphysema and pneumonia did that. The government was not responsible for DeLacy's bronchial problems. It did not interfere with DeLacy's ability to seek medical help from private sources. It did not even promise to send help but fail to do so. Giese, and thus the state, underestimated the seriousness of

DeLacy's problem, rendered inept medical advice, and declined to offer transportation to a hospital. The plaintiffs contend that this adds up to an unconstitutional "abuse of power".

Since Giese had no "power" over DeLacy and did not injure her, cases such as *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), holding that excessive force in making an arrest violates the fourth amendment, do not assist the plaintiffs. The "shocks-the-conscience" approach of *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), is not an ambulatory source of authority to impose damages on public officials for sins of omission or everyday torts. See *Lester v. City of Chicago*, 830 F.2d 706, 710 (7th Cir.1987) (the "reasonableness" requirement of the fourth amendment, and not principles of substantive due process, will be used to assess injuries during an arrest); *Williams v. Boles*, 841 F.2d 181 (7th Cir. 1988) (the eighth amendment, not substantive due process, provides the standards to assess injuries inflicted on prisoners). It is too indeterminate to offer notice to officials of the rules they must follow; it invites retrospective analysis instead of inquiring into the circumstances known at the time of the action; it dwells on imputed intent rather than on the objective circumstances. See *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 465–66. (7th Cir. 1988). Cf. *Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (damages are available for constitutional torts only if reasonable officials would have known at the time of their conduct that the behavior was unconstitutional). That judges or jurors may believe that Giese acted foolishly or even heartlessly toward DeLacy is of no moment unless he violated a duty imposed by law.

State law is one potential source of such a duty. Section 5.11.020 of Racine's municipal code requires the fire department to answer calls. Fire Chief Chiapete ordered the City's dispatchers to send medical help for every emergency (though he did not define "emergency"). The law of torts requires volunteer rescuers to be competent. So Giese may have violated a duty of care

imposed by the combination of the municipal code and tort law. "May have" because § 323 of the **Restatement (2d) of Torts** provides that a rescuer is liable only to the extent the lack of reasonable care "increases the risk of ... harm" or the "harm is suffered because of the other's reliance upon the undertaking." Giese's conduct did not increase the risk of DeLacy's death (the paper bag did not asphyxiate her), and the record does not establish that she relied on his advice in deciding not to seek aid from other sources.[3] We shall assume nonetheless that Giese could have been held liable to the plaintiffs under Wisconsin law. See *Sanem v. Home Insurance Co.*, 119 Wis.2d 530, 350 N.W.2d 89 (1984) (adopting § 323 of the **Restatement** as a theory of liability in Wisconsin).[4] See also *O'Neill v. Montefiore Hospital*, 11 A.D.2d 132, 202 N.Y.S.2d 436 (1960) (liability for giving free, though careless, advice by telephone to a stranger). Cf. *Kirk v. Michael Reese Hospital*, 117 Ill.2d 507, 525–33, 111 Ill.Dec. 944, 961, 513 N.E.2d 387, 396–99 (1987). But this is a suit under § 1983, and the Constitution does not duplicate state law. It constrains the state from "abusing governmental power, or employing it as an instrument of oppression", *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). Thus plaintiffs' syllogism in an effort to transmute a common law tort into a constitutional tort: state law required Giese to render competent rescue services; this was a duty; officials of the government must do their duty; failure to do one's duty is an abuse of one's office; abuse of office is abuse of governmental power; abuse of governmental power violates the Constitution.

The difficulty with this approach is that all the intermediate steps are window dressing. Because there is no tort without a duty of care, the argument as a whole adds up to the claim that torts by governmental officials violate the Constitution. It is another form of the contention that the Constitution requires a state to obey its own law. A reader could see in the phrase "due process of law" a requirement of "obedience to law", and there is some historical support for such a view, see *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1856), at least to the extent "law" meant procedures established by law. The phrase does not have such a meaning for the contemporary Court, however, for that body has rejected the equivalence repeatedly, e.g., *Barney v. City of New York*, 193 U.S. 430, 24 S.Ct. 502, 48 L.Ed. 737 (1904); *Herbert v. Louisiana*, 272 U.S. 312, 316, 47 S.Ct. 103, 104, 71 L.Ed. 270 (1926); *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944); *Davis v. Scherer*, 468 U.S. 183, 193–96, 104 S.Ct. 3012, 3018–20, 82 L.Ed.2d 139 (1984).[5] As the Court put it in *Snowden:*

> If the action of the Board is official action it is subject to constitutional infirmity to the same but no greater extent than if the action were taken by the state legislature. Its illegality under the state statute can neither add to nor subtract from its constitutional validity. Mere violation of a state statute does not infringe the federal Constitution. And state action, even though illegal under state law, can be no more or less constitutional under the Fourteenth Amend-

---

**3.** Hiles testified that before making the first call he urged DeLacy to seek help but that "[s]he jumped back in bed and said, 'I'll be okay.'" Tr. 262. She repeated the comment during the afternoon. Hiles did not testify that DeLacy ever asked him to take her to the hospital or expressed a desire for assistance.

**4.** Just how far this would go in light of the restrictions in § 323 is a question we need not address. Wisconsin also has modified § 323 by adopting a broad "Good Samaritan" statute protecting volunteer rescuers from liability. Wis. Stat. § 895.48(1) (effective June 17, 1987).

**5.** For recent, similar holdings in this court see, e.g., *Coniston*, slip op. 11; *Kasper v. Board of Election Commissioners*, 814 F.2d 332, 342 (7th Cir.1987); *Kompare v. Stein*, 801 F.2d 883, 888 (7th Cir.1986); *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 434–35 (7th Cir.1986); *Carson v. Block*, 790 F.2d 562, 565–66 (7th Cir.1986) (federal law). In other circuits see, e.g., *Stern v. Tarrant County Hospital District*, 778 F.2d 1052, 1058–59 (5th Cir.1985) (en banc) (same question presented under the Equal Protection Clause; collecting cases).

ment than if it were sanctioned by the state legislature.

321 U.S. at 11, 64 S.Ct. at 402, citations omitted.[6] A state ought to follow its law, but to treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state law. State rather than federal courts are the appropriate institutions to enforce state rules. Indeed, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). *Pennhurst* held that federal courts lack the authority to direct state officials to comply with state law. If the alchemist's wand can transmute a violation of state law into a violation of the Constitution, *Pennhurst* will be for naught, federal enforcement of state law the order of the day.

In one respect, and in one only, state law provides the basis for a claim under the Due Process Clause. Because "property" is defined by law, showing that one has "property" often depends on showing a legitimate claim of entitlement under state law. See *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and, e.g., *Upadhya v. Langenberg,* 834 F.2d 661 (7th Cir.1987). Once state law defines the substance, constitutional law establishes the minimum procedures. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 539–41, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985). This reference to state law as the basis of a constitutional claim does not assist plaintiffs, however, for the violation of state law is not itself the violation of the Constitution. *Bishop v. Wood,* 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976). The procedural guarantees of the Due Process Clause exist apart from state law, even though they depend on it. So, for example, if state law establishes procedural entitlements, these are not themselves property and will not be enforced in the name of the Constitution. *Olim v. Wakinekona,* 461 U.S. 238, 248–51, 103 S.Ct. 1741, 1746–48, 75 L.Ed.2d 813 (1983); *Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1081 (7th Cir.1987); *Shango v. Jurich,* 681 F.2d 1091, 1100–01 (7th Cir. 1982). Even the constitutional minima often will not be enforced in practice. If a state erratically deprives a person of property, the remedy is not a subsequent hearing but a suit to recover damage—in other words, the opportunity to obtain redress in state court *is* due process when a prior hearing is either infeasible or negligently withheld. See *Hudson v. Palmer,* 468 U.S. 517, 530–36, 104 S.Ct. 3194, 3202–05, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Ingraham v. Wright,* 430 U.S. 651, 674–82, 97 S.Ct. 1401, 1414–18, 51 L.Ed.2d 711 (1977). So it is here. It is hardly possible to hold hearings in advance to decide whether fire dispatchers will turn deaf ears to cries of distress. If, as the plaintiffs believe, Giese violated his duties under state law, the opportunity to press that claim in state court is due process of law.

Plaintiffs treat the rule of *Snowden* as an unfortunate one that we should struggle to get 'round. It is not part of this court's task to undermine decisions of the Supreme Court. For whatever it is worth, however, we do not think the rule regrettable. It implements distinctions at the core of our governmental structure—the distinction between the Constitution and law within the control of the political departments, and the distinction between state and federal rules. The basis of judicial review under *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177 (1803), is the hierarchy of rules. The Constitution, adopted by the People, is

---

6. Just as a violation of state law does not a constitutional claim make, so the violation does not protect officials from the federal consequences of their otherwise-unconstitutional conduct. *Home Telephone & Telegraph Co. v. City of Los Angeles,* 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1913). *Home Telephone* and *Snowden* together establish the indifference of constitutional norms to the content of state law.

beyond the control of their agents in the legislature; in the event of a conflict the Constitution must control; the hierarchy of rules, together with the nature of the Constitution as a law, supplies the authority for judges to follow the Constitution in the event of conflict, and to insist that others do the same. When the source of the rule or duty in question (here Racine's duty to respond to emergency calls) is not the Constitution but is within the control of political actors, federal courts have no rule external to the state's choices to enforce. We have only state law, which states may enforce, alter, or disregard so far as the Due Process Clause is concerned.[7] So *Martinez v. California*, 444 U.S. 277, 280–83, 100 S.Ct. 553, 556–58, 62 L.Ed.2d 481 (1980), found no constitutional difficulty in California's grant to parole officials of immunity in damages for violating state law. The state, as the source of the law, could withdraw the remedy for reasons it thought sufficient (in *Martinez*, promoting fearless decision making, even though the result could be, and was, to make officials more willing to release prisoners who might commit mayhem). So, too, there could be no substantial objection to Congress' decision to insulate the United States from liability for incompetent execution of discretionary accident-prevention services. *United States v. Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). See also, e.g., *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), among the many cases holding that the body with power to make (and unmake) the rule also may select the remedy for its violation.

A rule equating a violation of a statute with a violation of the Constitution might make states less willing to help their residents, because they could not limit the resources devoted to that task. The body with the power to create a rule also has the right incentives to police it. Cities and states are not hostile to their own laws; they do not need federal courts to prod them to enforce rules voluntarily adopted, although federal courts may be indispensable in ensuring that states adhere to constitutional norms (which the states may bitterly resent). The political branches have little reason to afford inadequate remedies for torts. The residents as a whole gain from both the compensatory and deterrent effects of tort law; such a widely supported body of law will not wither without constitutional fertilizer; voices abroad in the land do not whisper about the inadequate contemporary enforcement of tort law! Cf. *Carson*, 790 F.2d at 565. A rule that may be altered by political actors ought not be enforced as if it were constitutional; a rule created by the states should be enforced by the states. If the plaintiffs are to recover, they must appeal to norms that the Constitution places beyond the states' control.

### III

One possible norm is a rule that whoever wields official power may not deliberately injure anyone. To injure is to deprive of life or liberty without due process. When holding in *Davidson* and *Daniels* that the Due Process Clause does not forbid negligent deprivations, the Court recognized that the Constitution forbids deliberate, unauthorized deprivations. Giese did not slay DeLacy, but his inaction coupled with bad advice was a step on the path to her death—enough so that a court might award damages in tort. The advice to breathe into a paper bag might have led DeLacy to think that she did not need further aid (though there was no testimony to that effect). Combining the rule against the deliberate deprivation of life with the tort law's view of causation, the plaintiffs could have a case for liability. With one more step: a weakening of the intent rule. Giese did not want DeLacy dead, so his conduct was not intentional the way that word is used in constitutional law. See *Personnel Administrator of Massachu-*

---

7. They may not selectively enforce their laws in ways that violate other rules, such as the prohibition of racial discrimination, *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), or the first amendment—they could not, for example, rescue Republicans but not Democrats—but in light of the district court's findings of fact this case poses no such problem.

*setts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

The Court sometimes treats the reckless infliction of injury as equivalent to intentional infliction. See *Whitley v. Albers,* 475 U.S. 312, 319–21, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986) (Cruel and Unusual Punishments clause); cf. *Daniels,* 474 U.S. at 334 n. 3, 106 S.Ct. at 667 n. 3 (reserving the question whether either recklessness or gross negligence would be enough to make out a due process claim). The equation of reckless with deliberate conduct is familiar, on the ground that reckless disregard of a great risk is a form of knowledge or intent. E.g., *Sunstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1039–40 (7th Cir.1977) (securities laws); Model Penal Code § 210.2(1)(b) (1980) (treating reckless homicide as murder). We assume that the Supreme Court would hold that recklessly causing the death of another deprives that person of life without due process of law.

An act is reckless in the pertinent sense when it reflects complete indifference to risk—when the actor does not care whether the other person lives or dies, despite knowing that there is a significant risk of death. See **Model Penal Code** 21 (defining recklessness as "conscious disregard of [a] risk ... [that] manifests extreme indifference to the value of human life"). See also *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085, adopting this court's definition in *Duckworth v. Franzen,* 780 F.2d 645, 652 (1985), of recklessness (or "deliberate indifference") in constitutional law as "an act so dangerous that the defendant's knowledge of the risk can be inferred". This is the standard used in criminal law, for as we have emphasized the use of the more lenient tort-law definition of recklessness would not adequately recognize the difference between constitutional and common law obligations. E.g., *Duckworth* and *Smith–Bey v. Hospital Administrator,* 841 F.2d 751, 759–60 (7th Cir.1988).

Giese was not reckless in the constitutional sense. The district court called his acts "stupid" or "just poor judgment" (627 F.Supp. at 771), not reckless. He did not know that DeLacy was near death; he did not even know that she had a chronic respiratory problem. Giese inquired about DeLacy's problems; he did not simply refuse to listen and hang up. When Giese asked DeLacy whether she had experienced the breathing problem before, she answered "once". During the second call, Hiles told Giese that DeLacy had experienced a similar problem "once in a while". These comments would not have alerted every caring person that DeLacy had a chronic respiratory problem (which emphysema is), now propelled by pneumonia to a life-threatening point. No trier of fact could infer that Giese was indifferent to the value of human life.

■ Giese certainly was negligent, meaning that the cost of taking precautions (dispatching a rescue squad that was standing by) was less than the expected benefits (the value of a life, multiplied by the probability that the life would be lost in the absence of care). See *United States v. Carroll Towing Co.,* 159 F.2d 169 (2d Cir. 1947) (L. Hand, J.); *United States Fidelity & Guaranty Co. v. Jadranska Slobodna Plovidba,* 683 F.2d 1022, 1025–26 (7th Cir. 1982). Giese may have been grossly negligent, meaning that the cost of taking precautions was substantially less than the expected benefits. The district judge was not asked to, and did not, choose between these characterizations. He did not need to, because gross negligence does not violate the Due Process Clause.

Gross negligence blends into negligence; there is an indistinct and unusually invisible line between benefits exceeding the cost of precautions (negligence) and benefits substantially exceeding the costs (gross negligence). The malleable quality of these terms has produced scoffing among many, who see gross negligence as simply negligence "with the addition of a vituperative epithet." *Wilson v. Brett,* [1843] 11 M. & W. 113, 116, 152 Eng.Rep. 737 (Rolfe, B.). See also Prosser & Keeton, **Torts** § 34. A line that cannot be policed is not a line worth drawing in constitutional law.

The line ought not be drawn even if it could be patrolled. The distinction between negligence and gross negligence does not respond to the functions of the Due Process Clause. The Court concluded in *Daniels* and *Davidson* that the Clause is designed to control abuses of governmental power, and on that account does not reach negligence but does proscribe intentional deprivations. "Recklessness" is a proxy for intent; "gross negligence" is not. To say that conduct is not reckless is to say that there is no basis for finding abuse of governmental power. An error is still an error, "gross" or not; "due process" does not mean "due care"; since *Daniels* and *Davidson* held that errors are not unconstitutional, it follows that "gross negligence" is not a sufficient basis of liability.[8] "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liabilities for injuries that attend living together in society." *Daniels*, 474 U.S. at 332, 106 S.Ct. at 666.

## IV

■ The last possibility we need consider is that the Constitution of its own force compels the government to rescue those in danger. A duty to rescue is attractive, for government ought not be indifferent to the welfare of its residents. Yet what is the source of the duty? "As a general matter, the State is under no constitutional duty to provide substantive services for those within its border." *Youngberg v. Romeo*, 457 U.S. 307, 317, 102 S.Ct. 2452, 2458, 73 L.Ed. 2d 28 (1982). See also, e.g., *Lyng v. United Auto Workers*, — U.S. —, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988) (no entitlement

to food stamps); *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (no entitlement to funding for medical care —abortions in particular). How could there be a "duty to rescue" in a Constitution that does not require the government to educate or provide minimal social welfare services for its residents?

The Due Process Clause is phrased in the negative. It says that a state shall not "deprive" residents of life, liberty, or property, save with due process. It does not require the state to furnish residents with property they lack, or ensure that they do not suffer loss at private hands.[9] For seventy years after the adoption of the fourteenth amendment, there was a serious constitutional question whether a state even *could* create a social welfare system of the sort that is common today. We therefore concluded that the Constitution in general, and the Due Process Clause in particular,

> is a charter of negative rather than positive liberties. ... The men who wrote the Bill of Rights were not concerned that Government might do too little for the people but that it might do too much to them. The Fourteenth Amendment, adopted in 1868 at the height of laissez-faire thinking, sought to protect Americans from oppression by state government, not to secure them basic governmental services.

*Jackson v. City of Joliet*, 715 F.2d at 1203. We held there that the Due Process Clause did not furnish a remedy to the estate of a person incinerated in his car while a police officer directed traffic around the blaze, not troubling to look for survivors.

---

**8.** Other courts have resolved this question in a number of different ways. One circuit has held that even recklessness is not sufficient for liability. *Washington v. District of Columbia*, 802 F.2d 1478, 1481 (D.C.Cir.1986). Another has held that recklessness or deliberate indifference is both necessary and sufficient for liability. *Bass v. Jackson*, 790 F.2d 260, 262–63 (2d Cir. 1986). Two more hold that gross negligence is enough. *Colburn v. Upper Darby Township*, 838 F.2d 663, 668 & n. 3 (3d Cir.1988) (over Judge Garth's vigorous dissent, *id.* at 675–81); *Metzger*

*v. Osheck*, 841 F.2d 518, 520 n. 1 (3d Cir.1988) (over Judge Weis's dissent, *id.* at 523); *Jones v. Sherrill*, 827 F.2d 1102, 1106 (6th Cir.1987); *Vinson v. Campbell County Fiscal Court*, 820 F.2d 194, 199–200 (6th Cir.1987). Still other courts have reserved the question. E.g., *Jackson v. Procunier*, 789 F.2d 307, 312 (5th Cir.1986).

**9.** For a contrary view see Comment, *Actionable Inaction: Section 1983 Liability for Failure to Act*, 53 U.Chi.L.Rev. 1048 (1986).

A string of cases before and since (see pages 1214–15 *supra*) illustrates the point. The state released a madman from confinement and failed to protect someone who, it should have realized, was in special danger; we held in *Bowers* that the Due Process Clause does not require the state to imprison maniacs or protect its citizens from them. See also *Martinez*. When a city's fire fighters walked out, the city retaliated with a lockout and refused to supply equipment to strikers who tried to put out a blaze; two children died; we held in *Jackson v. Byrne* that the Due Process Clause does not require a city to provide fire fighting services (even though, we assumed, the city's failure violated state law). When the bodyguards assigned to protect the wife of an officer on the narcotics squad left for the day, the wife was severely beaten by people holding a grudge against the husband, a risk the city well knew (hence the guards); we held on these particular facts in *Ellsworth* that the Due Process Clause did not require the city to protect the wife from this known risk. When a state's prison became tense, the administrators conducted business as usual, and in the ensuing riot three guards died and others were gravely wounded; we held in *Walker* that the Due Process Clause does not require a state to provide its employees with safe working conditions or protect them from murderers. When a social worker suspected that the child's father was beating him, she removed the child from the home, only to be overruled by higher officials implementing a policy of leaving children with their parents; the caseworker neglected continuing signs of abuse, and the father later beat the child into a vegetable; we held in *DeShaney* that the Due Process Clause does not ensure that social workers will be competent, even if incompetence exposes children to grave injury at private hands. Other courts of appeals have reached similar conclusions, adopting the principles generated by the sequence of cases in this circuit.[10]

The rule that the government need not protect its residents from private predators or their own misfortune is an implication of the language and structure of the Due Process Clause. Amendments designed to protect the people from the government, to cut it down to size lest it repeat the excesses of George III and the slave states, amendments adopted when governmental services were more likely to be viewed as forbidden than as desirable, amendments phrased as prohibitions on governmental action rather than requirements of it, are not a plausible source of mandatory rescue services. Having held in Parts II and III than the Due Process Clause requires of the state less than the common law of torts requires of private rescuers, we cannot very well turn around and use the same text as the fount of rescue services—for the common law does not require anyone to volunteer as a rescuer. **Restatement (2d) of Torts** § 314 ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.")

To say this is not to rely on a sharp distinction between "negative" and "positive" rights. As we said at the outset, it is frequently possible to state a "positive" right in "negative" terms (e.g., "No state shall collect taxes unless it uses some of them to provide competent rescue services to its residents."). See David P. Currie, *Positive and Negative Constitutional Rights*, 53 U.Chi.L.Rev. 864 (1986). The Supreme Court sometimes uses the negative rights of the Constitution as the foundation for positive ones. The best known example is *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), combining negative language in the Due Process Clause with ambiguous language

---

**10.** E.g., *Washington v. District of Columbia*, 802 F.2d 1478, 1480–82 (D.C.Cir.1986); *Estate of Gilmore v. Buckley*, 787 F.2d 714, 720–23 (1st Cir. 1986); *McClary v. O'Hare*, 786 F.2d 83, 88–89 (2d Cir.1986); *Harpole v. Arkansas Dep't of Human Services*, 820 F.2d 923 (8th Cir.1987); *Ketchum v. Alameda County*, 811 F.2d 1243 (9th Cir.1987); *Escamilla v. City of Santa Ana*, 796 F.2d 266 (9th Cir.1986); *Wideman v. Shallowford Community Hospital, Inc.*, 826 F.2d 1030, 1034–37 (11th Cir.1987). Contra, *Estate of Bailey v. County of York*, 768 F.2d 503, 510–11 (3d Cir.1985), a decision we considered and expressly rejected in *DeShaney*, 812 F.2d at 303–04. Dicta supporting the position in *Bailey* appear in *Jansen v. Conrad*, 747 F.2d 185 (4th Cir.1984).

in the Counsel Clause of the sixth amendment to hold that the state must provide a lawyer free of charge to criminal defendants who cannot afford one—if imprisonment lies in prospect, *Scott v. Illinois*, 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979). See also *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), holding that if the state makes a transcript a practical necessity for appeal in a criminal case, it must furnish transcripts to indigent defendants even though there is no independent constitutional right to an appeal, and *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), holding that a state may not insist that indigent persons come up with the $60 filing fee to initiate a divorce proceeding.

██ These and similar cases depend on the role of the state as the initiator (in criminal cases) or as holder of a legal monopoly (in the divorce case). Having put the citizen on the defensive, or having stripped away avenues of self-help, the state must afford a procedure reasonably likely to reach an accurate conclusion even if that means the implication of positive rights from negative ones. When the government does not monopolize the avenues of relief, or when it has already afforded process sufficient to yield accurate decisions, it has no further obligation to give aid. See *United States v. Kras*, 409 U.S. 434, 445, 93 S.Ct. 631, 637, 34 L.Ed.2d 626 (1973); *Ortwein v. Schwab*, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973); *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974); *United States v. MacCollom*, 426 U.S. 317, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976); *Pennsylvania v. Finley*, — U.S. —, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987).

Here, too, the constitutional rule proves to be a shadow of the common law of torts, changing only the mental states on the rationale of *Daniels*.

One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

Restatement (2d) of Torts § 314A(4). ("Similar" refers to a duty "similar" to that of an innkeeper or common carrier to its customers.)

One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by

(a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or

(b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.

Restatement (2d) of Torts § 324. These are old and honored rules. See *South v. Maryland*, 59 U.S. (18 How.) 396, 15 L.Ed. 433 (1856).

The Cruel and Unusual Punishments Clause has been conformed to these principles explicitly. The jailer deprives the prisoner of avenues of self help and also exposes him to much greater risk (of assault by other prisoners). Accordingly the state must protect one prisoner from another, at least when it acts (or stands by) deliberately or with indifference to the prisoner's plight. E.g., *Walsh v. Mellas*, 837 F.2d 789 (7th Cir.1988); *Watts v. Laurent*, 774 F.2d 168 (7th Cir.1985). The state also must supply medical care for prisoners' serious conditions of which it is aware. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976). *Youngberg* gives the same reading to the Due Process Clause for wards of the state who are not prisoners. Once it has taken a person into custody, the state must afford humane medical treatment, *Youngberg* holds.

The state may take custody of a person, or propel him into danger, without formal imprisonment or civil commitment. We have suggested that if the government hurls a person into a snake pit it may not disclaim responsibility for his safety. *Bowers*, 686 F.2d at 618; *Walker*, 791 F.2d at 511. One application is that if one police officer starts beating a suspect without cause, the state (through other officers)

has a duty to rescue the suspect from this aggression. E.g., *Byrd v. Brishke*, 466 F.2d 6 (7th Cir.1972); *Rascon v. Hardiman*, 803 F.2d 269, 276 (7th Cir.1986). A second application is that if the state hauls away a child's parent and thereby exposes the child to danger, it will have to protect the child from the incremental risk. E.g., *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) (police arrested the driver of a car and took him away, leaving small children to fend for themselves on a superhighway).[11] Perhaps by parallel reasoning if the state suppressed private ambulance services, or so flooded the market with subsidized (or free) aid that private rescue services no longer could make a profit and hence disappeared, the state would have a duty to furnish ambulance services—though *Kras* looks the other way, for the government has a monopoly of bankruptcy services, yet the Court held that it may exclude persons too poor to go bankrupt.[12]

■ Courts sometimes sum up such cases by saying that the Due Process Clause requires the state to protect those with whom it has a "special relationship". See *Ellsworth*, 774 F.2d at 185. Like other legal phrases, this one has acquired a life of its own. Instead of being a shorthand for the kind of circumstances reflected in *Byrd* and *White* —cases in which the state either deliberately inflicted injury or greatly increased risk while constricting access to self-help—it has become a magic phrase, a category in which to dump cases when a court would like to afford relief. E.g., *Estate of Bailey v. County of York*, 768 F.2d 503, 510–11 (3d Cir.1985), a case whose reasoning and result we rejected in *DeShaney*, 812 F.2d at 303–04. See also *Harpole v. Arkansas Department of Human Services*, 820 F.2d 923, 926 (8th Cir. 1987) (approvingly reading *DeShaney* as "expressly reject[ing] the idea that a special relationship exists in situations other

than between a prison and its inmates."). Instead of trying to define the phrase with greater precision, it is better to jettison the language while adhering to the principles that the phrase once summarized. When the state puts a person in danger, the Due Process Clause requires the state to protect him to the extent of ameliorating the incremental risk. When a state cuts off sources of private aid, it must provide replacement protection.

■ The principles do not assist the plaintiffs, however. The state did not cause DeLacy's diseases or otherwise propel her into danger (breathing into a paper bag is not itself dangerous). It did not take DeLacy into custody. It did not hinder her from seeking other sources of aid; she could have called a private ambulance or asked Hiles or one of her relatives (who lived nearby) to take her to the local hospital. It therefore did not violate her rights under the Due Process Clause.

## V

A city that offers rescue services must make choices. It must decide how many false alarms to tolerate in order to render assistance to those in genuine need. It must decide how much to invest in these services, knowing that if subsidized public services displace private services the quality of care may fall because the public sector may fail to offer the salaries necessary to attract the best professionals into the field. It must decide on a level of care high enough to meet expectations legitimately engendered by the announcement of the service, without being so high as to induce people to rely excessively on what is supposed to be a safety net rather than a source of primary care.

Higher quality rescue services may come at the expense of a higher budget for the police or schools, or at the expense of high-

---

11. The dissenting opinion in *White* observed that the kids, out drag racing on the Chicago Skyway with their uncle, were in greater danger before the police took the uncle away than they were after. We need not decide whose characterization of the facts in *White* was best; we are concerned here only with the principle.

12. The government does not have a monopoly of debt-adjustment services (persons regularly settle debts outside the courts), so perhaps *Kras* may be reconciled with *Boddie,* but to the extent they conflict we are bound by the more recent decisions.

er taxes that induce people to relocate to low-service (and low-tax) jurisdictions. A city may decide to spend more on parks or museums and less on rescue, even though its officials know that recreation and education are coming at the expense of health. It may do this without subsequently answering in damages to people who subsequently expire before they reach a hospital. People through the democratic process may choose more or less safety by altering their support of the fire department, the police, the courts, schools, social welfare programs, and programs of safety inspections. This choice is one without a single right answer, and therefore one for the political rather than the judicial branches.

The City of Racine could decide:
- Not to have a rescue service, or
- To have a rescue service, but not one staffed by personnel as skilled as those in the private sector (thereby releasing part of its budget for other projects), or
- To have a rescue service, and to recruit top-quality personnel, but not to have a tort remedy for delicts (thereby leaving to first-party insurance the task of covering the slip-ups that are inevitable in the provision of medical care), or
- To have a rescue service, to seek to provide top-quality care, and to offer a tort remedy against the government itself, but to limit the remedy so that the costs of the tort system do not consume more total resources than the state is willing to devote to rescue, or
- To have a rescue service, to strive for perfection, and to offer full tort compensation as well.

Wisconsin apparently has chosen the fourth of these options. Its courts would have entertained this suit, but the maximum remedy available is $50,000. Wis. Stat. § 893.80(3). The plaintiffs thought that inadequate and pursued this litigation in hopes of recovering more.

Section 1983 is not, however, a source of authority for federal courts to revise the structural choices any government must make. Political society exists to choose among the many good things we all wish to have, but which cannot be attained simultaneously. A higher limit on recoveries would induce the government to take more care, but it might also induce the government to cut back on rescue services, helping DeLacy's heirs at the expense of those in need in the future. The Constitution does not require the state to hew to the best balance between effective care and expensive care—even if we knew what the best balance is. Dissatisfaction with the outcome of such a political choice is not a sufficient ground for declaring the structure unconstitutional.

AFFIRMED

POSNER, Circuit Judge, with whom FLAUM, Circuit Judge, joins, concurring.

I join the majority opinion but write separately to propose a slightly different though consistent view of the case.

The case presents a strong human appeal for federal judicial intervention. Although the district court's finding that race played no part in Giese's decision not to dispatch an ambulance is not clearly erroneous, one suspects that, if DeLacy (the victim) and Hiles (who called for the ambulance) had been white, Giese would not have been so casual about the situation and so quick to dispense his own medical advice. The victims in these failure-to-rescue cases appear to be drawn disproportionately from marginal segments of the community, where the ordinary political pressures for effective provision of public rescue services may be attenuated. And although Giese's gross negligence, which may well have cost DeLacy her life (I shall come back to the question of causation), cries out for a remedy in damages, the plaintiffs' tort remedy under Wisconsin law is inadequate because of the $50,000 ceiling on damages that Wisconsin imposes in suits against public agencies and employees. This ceiling is too low, under modern conceptions of the value of life, to provide adequate compensation and deterrence in a wrongful death case on behalf of a 43–year–old woman, even though she was not in good health and did

not have good earnings prospects (Mrs. De-Lacy was on welfare).

So plastic is the language of the due process clause of the Fourteenth Amendment, at least when viewed against the ambiguous history of the term "due process" (a history discussed recently in *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 465 (7th Cir.1988)), that a respectable textual argument can be made in favor of the proposition that Giese deprived DeLacy either of her property or her life without due process of law. It is true that a right to the dispatch of an ambulance is remote from conventional notions of property, but this is not decisive against the argument, because the Supreme Court has, for purposes of the due process clause in any event, jettisoned those notions in favor of equating property to entitlement, and by doing so has brought within the protection of the clause all sorts of interests, such as tenure-employment rights, that are remote from traditional legal conceptions of property. See *Board of Regents v. Roth*, 408 U.S. 564, 577–78, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), and particularly *Goss v. Lopez*, 419 U.S. 565, 573, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975), where the right to attend public school was deemed a property right of which the plaintiff was held to have been deprived by a brief suspension. Although an entitlement for these purposes cannot be built on an expectation created merely by practices or probabilities (e.g., a high probability that executive clemency will be granted in particular circumstances, see *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 465, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981)), the ordinances and policies of the City of Racine can be viewed as a commitment to the residents of the city to dispatch an ambulance without fail in the event of an emergency.

And while Giese neither desired DeLacy's death nor even knew or suspected that she was in serious danger—thus making this case remote from cases of police brutality, the strongest cases for a federal constitutional tort remedy—his negligence may have been a cause of her death, in the normal tort sense of cause. A cause in that sense is a condition or event that made the harm of which the plaintiff is complaining substantially more likely to occur. See Calabresi, *Concerning Cause and the Law of Torts*, 43 U.Chi.L.Rev. 69 (1975). Had Giese done nothing—had he not answered Hiles' phone call at all—Hiles might well have phoned a private ambulance service and if a competent dispatcher had answered *that* call DeLacy might well have been saved. If so, Giese's negligent advice to Hiles was a cause of DeLacy's death. Our *DeShaney* case, now before the Supreme Court, is different in this regard because the victim in that case would probably have been no better off if the negligent caseworker had never intervened; he would simply have been beaten into a vegetative state by his father that much earlier. See *DeShaney v. Winnebago County Dept. of Social Services*, 812 F.2d 298, 302 (7th Cir. 1987), cert. granted, — U.S. —, 108 S.Ct. 1218, 99 L.Ed.2d 419 (1988). Another distinction is that a federal tort remedy would have placed the child-welfare authorities in an impossible position: sued for invasion of parental rights if they overprotected the child and sued for depriving the child of life, liberty, or property if they underprotected him. See 812 F.2d at 304.

Nevertheless I agree that the plaintiffs in the present case must lose. This is a routine personal-injury case. If it states a claim under the Constitution, then every such case is a constitutional case if the defendant is a public employee. And because the type of limitation that Wisconsin imposes on tort suits against its employees is common, we can expect that a large fraction of such cases would be brought in federal courts as constitutional cases rather than in state court as ordinary common law tort cases. Nothing distinguishes this case from every other public-employee tort case in which the plaintiff dies or is injured or suffers a property loss, except that Giese's negligence is plain enough to be described as gross. The line between ordinary and gross negligence is too fine to constitute a satisfactory demarcation between federal and state jurisdiction; the

distinction has largely been discarded in tort law, as unworkable.

The combination of the procedural innovations that have in the last quarter century revitalized 42 U.S.C. § 1983 (the main vehicle for constitutional tort litigation), with the interpretations of the Fourteenth Amendment that in the same period have vastly expanded the amendment's substantive and procedural limitations upon state action, threaten between them to transfer almost the whole of public contract law and public-employee tort law from the state courts to the federal courts. Not only are the federal courts unprepared for such an influx of litigation, but the transference would be inconsistent with a rational allocation of governmental responsibilities between the states and the federal government. The Supreme Court and the lower federal courts have therefore attempted to come up with limiting principles, and while the scope of those principles is not entirely clear (perhaps the Court will clarify their scope in the *DeShaney* case), they appear to defeat the effort by the plaintiffs in this case to demonstrate either a deprivation of property or a deprivation of life.

The entitlement on which the plaintiffs rely is not an entitlement to demand the dispatch of an ambulance—no one could be so foolish as to suppose that if one phones for an ambulance and refuses to give the dispatcher any reason, or gives him an absurd reason (my cat has a hair ball in its stomach), the dispatcher is violating the caller's rights by refusing to send an ambulance. The only entitlement here is an entitlement to place before the dispatcher information which if true would require him to conclude that there was an emergency and therefore send the ambulance. DeLacy was deprived of this entitlement only by the negligence, possibly the gross negligence, of Giese. So if I am right that the line between negligence and gross negligence is not satisfactory as a jurisdictional benchmark, this is a case of negligent deprivation only, and we know from *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), that negligent deprivations of life, liberty, or property are not actionable under the Constitution. It is

therefore moot whether the entitlement I described is definite enough to count as property under the due process clause; it may well not be, cf. *Yatvin v. Madison Metropolitan School District*, 840 F.2d 412, 417 (7th Cir.1988).

The analysis of the claim that Giese deprived DeLacy of her life is the same. If he did so, he did so negligently—not intentionally, or recklessly in the sense in which recklessness is a form of intentionality (see *Whitley v. Albers*, 475 U.S. 312, 321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986); *Duckworth v. Franzen*, 780 F.2d 645, 652–53 (7th Cir.1985)) and not merely a vivid appellation for gross negligence, see *id.* at 653. But in addition, a case that preceded *Daniels*—*Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980)—suggests that merely increasing the probability of death by the uncertain amount involved in this as in most failure-to-rescue cases does not rise to the level of depriving the victim of his life; a deprivation of life in the constitutional sense requires more than the minimal causal relationship that may suffice under common law tort principles.

Admittedly there is tension between the decision today and cases such as *White v. Rockford*, 592 F.2d 381 (7th Cir.1979), which impose liability for failure to rescue where the government placed the victim in a position of danger in the first place. The distinction between putting someone in a place of danger and enhancing the danger faced by someone who already is in danger (but through no fault of government) is a subtle one. We said in *DeShaney* that in the former case the government's conduct is apt to create a greater incremental probability of harm, and thus be a more palpable cause of the victim's injury, than in the latter case. The distinction is only one of degree, but perhaps of sufficient degree to make a constitutional difference, though that need not be decided in the present case. For this is not a case of the government's having placed the victim in danger; the danger to DeLacy came from her emphysema, though it was increased by Giese's negligence.

Although I am comfortable with the outcome of this case, I think that the State of

Wisconsin may well be open to criticism for having placed what appears to be an arbitrary limitation on the damages that may be awarded for torts committed by its state and local agencies and employees. People rely on the availability of competent rescue services, and where as here the provision of those services falls far below minimum levels of competence the state ought to be answerable in damages, if not to the same extent that a private provider of such services would be then at least to a greater extent than Wisconsin law allows. We were told at argument that no disciplinary proceedings have been brought against Giese. Maybe if Wisconsin did not impose so low a ceiling on damage awards against public employees the City of Racine would not have reacted so casually to an act of gross negligence, committed by an employee of the city, that had fatal consequences.

Granted, the ceiling discourages lawsuits, and limits liability in those lawsuits that are brought; and by doing these things it reduces the cost of public services in Wisconsin and may therefore increase the extent of those services. To put this differently, the state might react to greater tort liability by curtailing rescue services; and while someone in exactly Mrs. DeLacy's position might actually be better off as a result (for reasons discussed earlier), the people of Wisconsin as a whole might be worse off. (This, by the way, is another reason for not allowing these suits to be brought in federal court under 42 U.S.C. § 1983, which contains no limit on liability.) But there is no indication that Wisconsin's ceiling on damages reflects such considerations; it appears, as I have said, to be arbitrary. It merely exerts pressure to recharacterize common law tort suits as federal constitutional tort suits, and I doubt whether it is in the long-run best interests of the State of Wisconsin to encourage the federalization of its public-employee tort law.

CUMMINGS, Circuit Judge, with whom CUDAHY, Circuit Judge, joins, dissenting.

Grossly negligent conduct or reckless disregard still may be actionable under 42 U.S.C. § 1983. That question has been reserved by the Supreme Court (*Daniels v. Williams*, 474 U.S. 327, 334 n. 3, 106 S.Ct. 662, 667 n. 3, 88 L.Ed.2d 662) and has been affirmatively answered as to gross negligence by the Third and Sixth Circuits, while recklessness or deliberate indifference is sufficient to state a claim in the Second Circuit. See n. 8 *supra*. Moreover, the facts of this case demonstrate a special relationship between the state and the victim, requiring minimum competent action by defendant Giese while overseeing Rena DeLacy. See generally *Taylor v. Ledbetter*, 818 F.2d 791, 797–798 (11th Cir.1987) (*en banc*) (applying special relationship theory to relationship between the state and a child it placed in a foster home). Unlike the majority, we cannot definitively assert the contrary because certiorari was recently granted on that issue in *DeShaney v. Winnebago County Dept. of Social Services*, 812 F.2d 298 (7th Cir.1987), 108 S.Ct. 1218. Even the defendant conceded at oral argument that it would be liable if a special relationship existed between it and DeLacy. Since the state effectively took control over DeLacy's physical welfare when Giese instructed her to breathe into a paper bag instead of dispatching the ambulance, it was responsible for providing her with adequate protection from harm and her ultimate demise. *Walker v. Rowe*, 791 F.2d 507, 511 (7th Cir.1986). As in *Nishiyama v. Dickson County, Tenn.*, 814 F.2d 277, 283 (6th Cir.1987) (*en banc*), Giese was entrusted by the state with the power to save DeLacy's life and his complete failure to dispatch her aid can be deemed gross negligence or reckless indifference and hence actionable under Section 1983.

Until the Supreme Court decides *DeShaney*, I will adhere to the panel opinion herein. 826 F.2d 480 (7th Cir.1987).

RIPPLE, Circuit Judge, with whom CUMMINGS and CUDAHY, Circuit Judges, join, dissenting.

The Supreme Court of the United States has granted certiorari in *DeShaney v. Win-*

*nebago County Dept. of Social Servs.*, 812 F.2d 298 (7th Cir.1987), *cert. granted*, — U.S. —, 108 S.Ct. 1218, 99 L.Ed.2d 419 (1988). The Supreme Court's opinion in *DeShaney* will undoubtedly provide important and, in all likelihood, controlling guidance with respect to the final disposition of this case. Under these circumstances, our respect for the decision-making processes of that Court and our responsibility to prevent the incursion of unnecessary litigation costs by the parties before us counsels against our rendering a decision in this case in advance of the Supreme Court's decision in *DeShaney.*

However, because my brothers have decided to act at this time, I am constrained to reach the merits. Yet, in doing so, I do not believe that I can ignore the pendency of *DeShaney.* If this court is to dispose of this case now, its decision ought to be in strict conformity with the established law of the circuit. This is hardly a time to break new ground; higher authority has already informed us, by the grant of certiorari, that any new ground will come from its pen, not from ours.

As the court noted in *Walker v. Rowe,* 791 F.2d 507 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986), the case law of this circuit establishes that "when the state takes someone into its care or cuts off sources of private aid, the state must afford replacement protection.... Sometimes we shorten this inquiry to a search for a 'special relationship' between the state and the person to be protected. Whatever the name, the rationale lies in constraints the state imposes on private action." *Id.* at 511 (citations omitted). As the court put the point in *Bowers v. DeVito,* 686 F.2d 616 (7th Cir.1982), all of these cases are variations on the principle that "[i]f the state puts a man in a position of danger from private persons and then fails to protect him ... it is as much an active tortfeasor as if it had thrown him into a snake pit." *Id.* at 618; *see also Ellsworth v. City of Racine,* 774 F.2d 182, 187 (7th Cir.1985) (Coffey, J., concurring), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986).[1]

Mr. Giese did not only fail to dispatch an ambulance to Mrs. DeLacy. He also counseled her with respect to the appropriate

1. Judge Coffey concurred in the judgment of the court on the ground that the plaintiff had relieved the city of its *special duty to her* by discharging her bodyguard because she did not think it was necessary for the officer to stay. *Ellsworth v. City of Racine,* 774 F.2d 182, 186–87 (7th Cir.1985). Nevertheless, he wrote, "I believe that if it were not for this admission, the plaintiff's complaint would state a cause of action under 42 U.S.C. § 1983 (1982)." *Id.* at 186. With respect to the "special relationship" concept he wrote:

The due process clause of the 14th Amendment encompasses a right to be free from "unjustified intrusions on personal security" such as the plaintiff suffered at the hands of her attacker. *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1976). *See also, White v. Rochford,* 592 F.2d 381, 383 (7th Cir.1979) ("*White*"). Although the City has no general duty to protect members of the public from such danger, *Jackson v. Byrne,* 738 F.2d 1443, 1446 (7th Cir.1984) ("*Byrne*"); *Jackson v. City of Joliet,* 715 F.2d 1200, 1203–04 (7th Cir.1983) ("*Joliet*"); a constitutional duty to protect the personal security of specific members of the public exists under certain "special relationship[s]". *Byrne,* 738 F.2d at 1446–47. I agree with the majority that "what constitutes a 'special relationship' ... [is] hazy and indistinct." How-

ever, I would not be as hasty as the majority to conclude that "[u]pon reviewing the facts of this case, we are unable to include within the concept of 'special relationship' the relationship between the city and the [plaintiff]."

A review of the cases suggests at least two factors to consider in deciding whether a special relationship exists. One factor that has been stressed is whether the danger which the defendant allegedly had a duty to prevent was directed at the public at large or only at a specific individual. *See Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980); *Fox v. Custis,* 712 F.2d 84, 88 (4th Cir.1983). Another factor to consider is how closely the danger to the plaintiff is linked to actions of the defendant. *See Byrne,* 738 F.2d at 1446. Taking the allegations of the complaint as true, in the instant case, the defendant had clear notice of a specific danger to the plaintiff. The danger was limited to the plaintiff and her family and did not encompass the general public.

Moreover, the danger arose as a result of the City's actions in investigating and prosecuting illegal drug dealings in the City of Racine. I am not prepared to say that, given these allegations, no "special relationship" between the city and the plaintiff could be found in this case.

*Id.* at 187.

medical treatment for her complaint. Moreover, he affirmatively discouraged her and the person with her from seeking other medical assistance. Under our cases, such an assumption of responsibility, coupled with a discouragement of seeking other help, constitutes the sort of conduct that we have held actionable. Moreover, the record contains sufficient evidence to permit a jury to determine that this action was undertaken at a level of performance which would permit recovery under *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). On this basis, I would reverse the judgment of the district court and remand the case for further proceedings.