K.L., L.F., and R.B., on behalf of themselves and all persons similarly situated, Plaintiffs,

v.

Jim EDGAR, Governor of the State of Illinois, and Ann Patla, Director of the Illinois Department of Mental Health and Developmental Disabilities, Defendants.

No. 92 C 5722.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 30, 1996.

Joseph A. Starkman, Jeffrey W. Sarles, Mayer, Brown & Platt, Roger Pascal, Michael Neil Lloyd, Lisa Ann Brown, Schiff, Hardin & Waite, Colleen K. Connell, Harvey Michael Grossman, Benjamin S. Wolf, Susan Gail Wishnick, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, Ira James Belcove, Butler, Rubin, Saltarelli & Boyd, Chicago, IL, for plaintiffs.

Donna M. Lach, State's Attorney of Cook County, Joel Gerald Chefitz, Timothy J. Patenode, Kenneth Michael Kliebard, Laura A. O'Connell, Jeffrey G. Close, Katten, Muchin & Zavis, Chicago, IL, for Jim Edgar.

Donna M. Lach, State's Attorney of Cook County, Joel Gerald Chefitz, Timothy J. Patenode, Kenneth Michael Kliebard, Laura A. O'Connell, Jeffrey G. Close, Katten, Muchin & Zavis, William A. O'Connor, Lowell E. Sachnoff, Lyn Marie Schollett, Sachnoff & Weaver, Ltd., Chicago, IL, for Jess McDonald.

*MEMORANDUM OPINION AND ORDER*

ALESIA, District Judge.

Before the court are defendants Jim Edgar's and Ann Patla's motion for partial judgment on the pleadings and to simplify issues for trial, and plaintiffs' motion for leave to file an amended complaint. For the reasons that follow, defendants' motion for partial judgment on the pleadings and to simplify issues for trial is granted, and plaintiffs' motion for leave to amend their complaint is granted in part and denied in part.

## I. BACKGROUND

The class plaintiffs in this long-pending action, which is newly before this court, are persons who are or will be institutionalized for mental illness in mental health facilities operated by the State of Illinois. Plaintiffs claim that the conditions and practices in the state mental health facilities violate their rights to safety, freedom of movement, and adequate medical and psychiatric care and treatment under the Fourteenth Amendment. They have filed a class action lawsuit under 42 U.S.C. § 1983 for declaratory and injunctive relief to redress the alleged violations of their rights.

## II. DISCUSSION

**A. Defendants' motion for partial judgment on the pleadings** [1]

Defendants have moved for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) to challenge what defendants call "plaintiffs' classwide claims for community services." (Mem. in Support of Defs.' Mot. for Partial Judgment on the Pleadings at 2.) Specifically, defendants challenge the legal sufficiency of plaintiffs' allegations that:

(a) "[t]he institutions experience an excessively high recidivism rate, and they fail to discharge patients to appropriate placements or programs in the community when needed to avoid further injury or deterioration;"

(b) "[t]he institutions often attempt to keep patient population below the design capacity of the institution by abruptly discharging patients and refusing to admit others without regard to the needs of the patients or the presence of adequate therapeutic resources in the community;" and

(c) the institutions fail to plan for and deliver follow-up care need[ed] to prevent these patients from becoming homeless."

(Mem. in Support of Defs.' Mot. for Partial Judgment on the Pleadings at 2 (quoting Compl. ¶¶ 23, 24).)

Defendants argue that these allegations seek to impose a duty on the state to fund or provide benefits to plaintiffs while they are free of state custody, but that the state is not constitutionally required to provide such services to its citizens. Plaintiffs counter that the state may not affirmatively exercise its power to endanger the health and safety of its citizens, but that this is what the state does by discharging plaintiffs to the streets or inadequate private mental health facilities.

As a preliminary matter, the court notes that plaintiffs make claims in their response to defendants' motion that go far beyond what plaintiffs' complaint actually alleges. In addition, plaintiffs attempt to buttress their arguments with findings and conclusions by the former court-appointed experts in this case. The court has terminated the appointment of these experts and barred the parties from using the data compiled by them in this case. (*See* Minute Order dated September 4, 1996.) Moreover, before the court is a motion for judgment on the pleadings, not a motion for summary judgment. Therefore, in deciding defendants' motion, the court will consider nothing but the allegations in plaintiffs' complaint.

After reviewing the numerous cases cited by the parties in support of their positions, as well as doing its own research, the court finds that the state's obligations to its citizens such as plaintiffs are by no means clear. The cases regarding a state's duties to its

---

1. Defendants' motion to simplify issues for trial is really just part and parcel of their motion for partial judgment on the pleadings. Therefore, the court considers defendants' motion simply as one for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

citizens under the substantive due process clause of the Fourteenth Amendment are not in complete agreement, and for the most part are decided on the specific facts involved in each case. Thus, the court finds it necessary to examine, in a fair amount of detail, the key cases controlling the issues now before the court.

In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the United States Supreme Court considered for the first time the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment. Romeo, a 33–year–old man with the mental capacity of an 18–month–old child, could not talk or take care of himself. Upon Romeo's father's death, Romeo's mother, who could not care for Romeo or control his violence, had him committed to a state mental health institution. *Youngberg,* 457 U.S. at 309, 102 S.Ct. at 2454–55.

While in the state institution, Romeo was injured, by his own violence and by other residents, at least 63 times in less than two years. On one occasion, after Romeo was transferred from his ward to the hospital for treatment of a broken arm, Romeo was physically restrained during portions of each day. *Youngberg,* 457 U.S. at 310–11, 102 S.Ct. at 2455.

Romeo's mother filed a complaint against the state, alleging that the defendant state officials knew or should have known that Romeo was suffering injuries and that they failed to institute appropriate preventive procedures; that they restrained Romeo for prolonged periods; and that they failed to provide him with appropriate treatment or programs for his mental retardation. *Youngberg,* 457 U.S. at 310–11, 102 S.Ct. at 2454–55.

After a jury trial, a jury returned a verdict for defendants, and Romeo appealed. The Court of Appeals for the Third Circuit reversed and remanded for a new trial, finding that the involuntarily committed retain liberty interests in freedom of movement and personal security, and have a liberty interest in habilitation designed to treat their mental retardation. *Youngberg,* 457 U.S. at 312–13, 102 S.Ct. at 2456–57. The Supreme Court

granted *certiorari* to decide the question whether Romeo had substantive rights under the Fourteenth Amendment to safe conditions of confinement, freedom from bodily restraints, and training or habilitation. *Youngberg,* 457 U.S. at 309, 314, 102 S.Ct. at 2454, 2457.

The Supreme Court decided in short order that the rights to safe conditions of confinement and freedom from bodily restraints had been recognized in prior court decisions, and that those rights are not extinguished by involuntary commitment. *Youngberg,* 457 U.S. at 315–16, 102 S.Ct. at 2458. The Court found Romeo's claimed constitutional right to minimally adequate habilitation "more troubling." *Youngberg,* 457 U.S. at 316, 102 S.Ct. at 2458.

The Court stated:

In addressing the asserted right to training, we start from established principles. As a general matter, a State is under no constitutional duty to provide substantive services for those within its borders. *See Harris v. McRae,* 448 U.S. 297, 318, 100 S.Ct. 2671, 2689, 65 L.Ed.2d 784 (1980) (publicly funded abortions); *Maher v. Roe,* 432 U.S. 464, 469, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484 (1977) (medical treatment). When a person is institutionalized—and wholly dependent on the State—it is conceded by petitioners that a duty to provide certain services and care does exist, although even then a State necessarily has considerable discretion in determining the nature and scope of its responsibilities. *See Richardson v. Belcher,* 404 U.S. 78, 83–84, 92 S.Ct. 254, 258–259, 30 L.Ed.2d 231 (1971); *Dandridge v. Williams,* 397 U.S. 471, 478, 90 S.Ct. 1153, 1158, 25 L.Ed.2d 491 (1970). Nor must a State "choose between attacking every aspect of a problem or not attacking the problem at all." [*Dandridge*], [397 U.S.] at 486–487, 90 S.Ct. [ ] at 1162–1163.

*Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2459.

The Court noted that Romeo conceded that no amount of training would make possible his release, and that Romeo did not argue that if he were still at home, the state would have an obligation to provide training at its

expense. *Id.* The Court found that Romeo's primary needs were bodily safety and a minimum of physical restraint, and that he claimed a right to training related to those needs. *Id.*

The Court thus stated: "As we have recognized that there is a constitutionally protected liberty interest in safety and freedom from restraint, ... training may be necessary to avoid unconstitutional infringement of those rights." *Youngberg,* 457 U.S. at 318, 102 S.Ct. at 2459. The Court also noted that because Romeo sought only training related to safety and freedom from restraints, the case did not present "the difficult question of whether a mentally retarded person, involuntarily committed to a state institution, has some general constitutional right to training *per se,* even when no type or amount of training would lead to freedom." *Id.*

In a case shortly following *Youngberg,* the Court of Appeals for the Seventh Circuit addressed whether Illinois violated the rights of persons in its mental health facilities by failing to develop less restrictive alternatives to the state facilities in which the persons were placed. *See Phillips v. Thompson,* 715 F.2d 365 (7th Cir.1983).

The plaintiffs in *Phillips* were among several hundred higher functioning but mentally retarded adults who, in December 1979, were living at the privately owned and operated North Aurora Center under a program sponsored by the state. On December 15, 1979, the North Aurora Center closed, after giving only 24 hours' notice of its intent to do so. Representatives of the Illinois Department of Mental Health and Developmental Disabilities (DMHDD) then moved the state-sponsored residents to state mental institutions. *Id.* at 366.

Plaintiffs filed suit against the governor, officials of DMHDD, and the Illinois Department of Public Health, alleging that the state institutions in which the DMHDD placed them unnecessarily restricted their personal liberties, and that the defendants had failed to develop alternatives that would be less restrictive. Plaintiffs alleged that the defendants' failure to develop less restrictive alternatives violated plaintiffs' rights under the Fourteenth Amendment and other laws. *Id.*

After a bench trial, the district court decided against plaintiffs on certain issues and dismissed the rest of the case. Plaintiffs appealed. Among other things, plaintiffs argued that the district court should have heard and determined whether plaintiffs were illegally denied less restrictive alternative community residential living. *Id.* at 367.

The Seventh Circuit stated that it believed that *Youngberg* controlled the case. The court first found that the district court did not err in determining that the class members were not denied a due process right with respect to freedom of movement or training. *Id.* The court then stated that with respect to plaintiffs' claim that they had a substantive due process right under the Fourteenth Amendment to care in a community residential setting, "the short answer is, as stated in *Youngberg:* 'As a general matter, a State is under no constitutional duty to provide substantive services for those within its borders.'" *Id.* (quoting *Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2459). The court thus rejected plaintiffs' claim to the right to care in a community residential setting.

Seven years later, in *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court again addressed the state's duty to protect its citizens, but in a context much different from that of *Youngberg.* Joshua DeShaney was a repeated victim of child abuse by his father, who was awarded custody of Joshua after he and Joshua's mother divorced. The Winnebago County authorities first learned that Joshua was a victim of child abuse in 1982, when Joshua was two or three years old. The Winnebago County Department of Social Services (DSS) interviewed the father, but he denied the accusations, and DSS did nothing further. *DeShaney,* 489 U.S. at 191–92, 109 S.Ct. at 1001.

In January 1983, Joshua was admitted to a hospital with multiple bruises and abrasions. The examining physician suspected child abuse and notified DSS, which immediately obtained a judicial order placing Joshua in temporary custody of the hospital. Three days later, the county convened a "Child

Protection Team" to consider Joshua's situation. The team decided that it had insufficient evidence of child abuse to retain Joshua in the custody of the court. However, the team recommended some measures designed to protect Joshua. The measures included enrolling Joshua in pre-school, providing Joshua's father's with counseling services, and suggesting that Joshua's father's girlfriend move out. Joshua's father agreed to the measures. *DeShaney*, 489 U.S. at 192, 109 S.Ct. at 1001.

Based on the team's recommendation, the court dismissed the child protection case and returned Joshua to his father's custody. A month later, hospital emergency room personnel reported to the DSS caseworker handling Joshua's case that Joshua had returned to the hospital with suspicious injuries. The caseworker found no basis for action. *Id.*

For the next six months, the caseworker monthly visited Joshua's home and noticed various injuries to Joshua's head; she also noticed that Joshua was not enrolled in school and that Joshua's father's girlfriend had not moved out. The caseworker recorded her observances and her suspicion that Joshua was being abused, but did nothing more. *DeShaney*, 489 U.S. at 192–93, 109 S.Ct. at 1001.

In November 1983, emergency room personnel notified DSS that Joshua had been treated again for injuries they suspected to be caused by child abuse. The caseworker visited Joshua's home twice more, but was told Joshua was too ill to see her. DSS still did nothing. *DeShaney*, 489 U.S. at 193, 109 S.Ct. at 1001.

In March 1994, Joshua's father beat him so severely that Joshua fell into a life-threatening coma. Joshua did not die but suffered brain damage so severe that he would spend the rest of his life in an institution for the profoundly retarded. *DeShaney*, 489 U.S. at 193, 109 S.Ct. at 1001–02.

Joshua and his mother sued DSS and several of its employees, alleging that the defendants violated Joshua's rights under the Fourteenth Amendment by failing to intervene to protect him against a risk of violence by his father about which they knew or should have known. *DeShaney*, 489 U.S. at 193, 109 S.Ct. at 1002. The district court granted summary judgment for the defendants. The Court of Appeals for the Seventh Circuit affirmed, holding that the due process clause of the Fourteenth Amendment does not require the state to protect its citizens from " 'private violence, or other mishaps not attributable to the conduct of its employees.' " *DeShaney*, 489 U.S. at 193–94, 109 S.Ct. at 1002 (quoting *DeShaney*, 812 F.2d 298, 301 (7th Cir.1987)).

The Supreme Court granted *certiorari* to determine "when, if ever, the failure of a state or local governmental entity or its agents to provide an individual with adequate protective services constitutes a violation of the individual's due process rights." *DeShaney*, 489 U.S. at 194, 109 S.Ct. at 1002.

The Court stated that the due process clause of the Fourteenth Amendment "confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney*, 489 U.S. at 196, 109 S.Ct. at 1003 (citing *Harris*, 448 U.S. at 317–18, 100 S.Ct. at 2688–89 (no obligation to fund abortions or other medical services); *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972) (no obligation to provide adequate housing); *Youngberg*, 457 U.S. at 317, 102 S.Ct. at 2458 (state "is under no constitutional duty to provide substantive services to those within its borders")).

The Court stated further that if the due process clause does not require the state to provide its citizens with particular protective services, then the state cannot be held liable for injuries that could have been averted had the state chosen to provide the services. *DeShaney*, 489 U.S. at 196–97, 109 S.Ct. at 1003–04. The Court thus concluded that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197, 109 S.Ct. at 1004.

The Court also rejected the argument that having actually undertaken to protect Joshua from danger, the state acquired an affirmative duty to do so in a reasonably competent

fashion. The Court recognized that *Youngberg* held that the due process clause requires the state to provide involuntarily committed mental patients with services that are reasonably necessary to ensure their reasonable safety from themselves and others. *DeShaney*, 489 U.S. at 199, 109 S.Ct. at 1005. It stated that " '[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed—who may not be punished at all—in unsafe conditions.' " *Id.* (quoting *Youngberg*, 457 U.S. at 315–16, 102 S.Ct. at 2457–58) (other citations omitted).

However, the Court stated that the cruel and unusual punishment cases involving prisoners, *Youngberg*, and *Youngberg's* progeny stand only for the proposition that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199–200, 109 S.Ct. at 1005.

The Court stated that the rationale for this principle is this: "When the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005 (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976); *Youngberg*, 457 U.S. at 315–16, 102 S.Ct. at 2457–58).

The Court stated that the affirmative duty of the state to protect arises not from the state's knowledge of the person's predicament or from the state's expressions of intent to help the person, but from the limitation that the state has imposed on the person's freedom to act on his own behalf. *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005–06. "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.*

Applying these principles to Joshua's case, the Court found that while the state may have been aware of the dangers Joshua faced, it played no part in their creation and did nothing to make Joshua more vulnerable to them. *DeShaney*, 489 U.S. at 201, 109 S.Ct. at 1006. Nor did it matter that the state at one time had taken temporary custody of Joshua, because when the state returned him to his father, it placed Joshua in no worse position than he would have been without the state's intervention; "the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *Id.* The Court concluded that the state had no constitutional duty to protect Joshua. *Id.*

Defendants contend that the foregoing cases, and others following them, preclude plaintiffs' claim that they are entitled to community services upon being released from the state institutions. Defendants argue that the cases make clear that the state is not required to provide substantive services to its citizens, including post-discharge care in private mental health facilities, and that the state's substantive due process obligations to an individual begin and end with the state's custody of the individual.

Plaintiffs counter that their allegations are not about general claims of free citizens to social services, but are about affirmative acts by the state that cause plaintiffs to suffer harm while they are confined to state hospitals—harm that continues and is compounded after plaintiffs are released. Plaintiffs contend that defendants discharge plaintiffs to inadequate private facilities, where they are treated badly, or to the streets, where they are abandoned, unable to function in the world outside the institutions. Plaintiffs argue that these practices of defendants are affirmative acts that endanger the health and safety of plaintiffs, and therefore that the

state is liable for the harm they cause to plaintiffs.

Plaintiffs cite *K.H. Through Murphy v. Morgan*, 914 F.2d 846 (7th Cir.1990), to support their contention. The state removed K.H. from her parents' custody when she was 18 months old, after K.H. was found to have contracted gonorrhea during vaginal intercourse. The state placed her with a foster parent. Two weeks later K.H. was transferred to another foster parent. Four months later K.H. was transferred to a third foster parent, with whom she remained for 10 months, before she was transferred to the fourth foster parent. K.H. remained with the fourth foster parent for more than a year, and then was returned to her natural parents. *Id.* at 848.

Three months later, the state again removed K.H. from her parents' custody on grounds of parental neglect, and placed her with a fifth foster parent. K.H. was now three years old. Soon K.H. was transferred to her sixth foster parent, who beat her and whose neighbor sexually abused her. When the hospital who treated K.H. told this to the state and advised the state that K.H. needed psychotherapy, the state did nothing except transfer K.H. to her seventh foster parent, who abused her physically. After this last abuse was discovered, K.H. was transferred to a state institution, where she received safe and professional care. *Id.*

To pay for her safe and professional care, K.H., through her guardian *ad litem*, filed a complaint pursuant to 42 U.S.C. § 1983 against the Illinois Department of Children and Family Services and various state officials. *Id.* at 847, 848. After the district court denied defendants' motion to dismiss based on their defense of immunity, defendants appealed. *Id.* at 847.

The Seventh Circuit first noted that K.H.'s case was not a "'positive liberties' case like *DeShaney*, where the question was whether the Constitution entitles a child to governmental protection against physical abuse by his parents or by other private persons not acting under the direction of the state." *Id.* at 848–49. Rather, in K.H.'s case, the state removed a child from the custody of her parents; and having done so, it could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it could deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be endangered, without violating his rights either under the cruel and unusual punishments clause of the Eight Amendment ... if he was a convicted prisoner ... or the due process clause if he was awaiting trial.

*Id.* at 849 (citations omitted). "In either case, the state would be a doer of harm rather than merely an inept rescuer...." *Id.* (citations omitted).

The court noted that the state could have left K.H. "to the tender mercies of her parents" without violating her rights under the constitution. But, having removed K.H. from her parents' custody, the state assumed at least a limited responsibility for her safety. *Id.* "Once the state assumes custody of a person, it owes him a rudimentary duty of safekeeping no matter how perilous his circumstances when he was free." *Id.*

Thus, as in *Youngberg,* and in contrast to *DeShaney,* K.H.'s substantive due process rights sprung from the fact that she was removed from her parents' custody and was effectively in the state's custody when she suffered her injuries.

The other cases cited by plaintiffs in support of their argument demonstrate that it is only when the state created the danger faced by its citizens or knowingly placed its citizens in danger to which they otherwise would not be exposed that the state may be held liable for any harm that comes to its citizens.

In *Bank of Illinois v. Over,* 65 F.3d 76 (7th Cir.1995), an Illinois state court had awarded a mother temporary custody of her child, but had given the father visitation rights on weekends under certain restrictions. More than a year after the order was entered, while the child was in her father's home on a weekend visit not in compliance with the restrictions imposed on the visits, the son of her father's lover beat the child. *Id.* at 77.

The child's mother filed suit against employees of the Illinois Department of Children and Family Services (DCFS), alleging that the DCFS employees demonstrated reckless indifference to the child's safety. While the lawsuit was pending, the mother's and father's parental rights were terminated, DCFS obtained custody of the child, and the court appointed the Bank of Illinois to represent the child in the lawsuit. *Id.*

Referring to *DeShaney*, the court stated that a state that negligently or even recklessly fails to protect a resident from private aggression does not deprive the resident of life, liberty, or property, because there is no constitutional duty to protect people from private violence. *Id.* The court found the case indistinguishable from *DeShaney*. *Id.* at 78.

However, the court stated that if the DCFS employees had knowingly placed the child in a position of danger, they would not be shielded from liability by *DeShaney*. *Id.* It stated that *DeShaney* and its progeny simply hold that the constitution does not impose a legally enforceable duty on state officers to protect people from private violence; but if the officers are complicit in the violence, they are liable for it. *Id.* (citing *K.H.*, 914 F.2d at 849; *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir.1992), *cert. denied*, 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993); *Freeman v. Ferguson*, 911 F.2d 52 (8th Cir. 1990)). Because the court found no suggestion that the DCFS employees had knowingly placed the child in a position of danger, it affirmed summary judgment in favor of the defendants.

Similarly, in *Reed v. Gardner*, 986 F.2d 1122 (7th Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993), the court found that state police may be liable for harm that comes to citizens, because of police intervention. In *Reed*, state police arrested a driver of a car, but left the car and the keys with an intoxicated passenger. The passenger then drove the car and caused an accident that killed two people and injured five others. *Id.* at 1123–24. The decedents' estates and those injured in the crash sued employees of the state and local police and county sheriff's department, alleging that the defendants violated the plaintiffs' due process rights by creating a dangerous situation and failing to protect them from it. *Id.* at 1125.

The court noted that *DeShaney* "leaves the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger." *Id.* (citing *DeShaney*, 489 U.S. at 201, 109 S.Ct. at 1006 ("While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them . . . : [I]t placed him in no worse position than that in which he would have been had it not acted at all . . . ."); *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir.1992) (*en banc*), *cert. denied*, 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993) ("[T]he Due Process Clause imposes a duty on state actors to protect or care for citizens in two situations: first, in custodial and other settings in which the state has limited the individuals' ability to care for themselves; and second[,] when the state affirmatively places a particular individual in a position of danger the individual otherwise would not have faced") (citations omitted)).

The court found that the case before it was distinguishable from cases in which state actors had no part in creating a danger but did nothing when " 'suspicious circumstances dictated a more active role for them.' " *Reed*, 986 F.2d at 1125 (citing *DeShaney*, 489 U.S. at 203, 109 S.Ct. at 1007; *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir.1988) (*en banc*), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989) (no section 1983 liability for failure to provide requested emergency services).

The court stated that *DeShaney* and its progeny make clear that the police have no affirmative obligation to protect citizens from drunk drivers. *Reed*, 986 F.2d at 1125. "Taken to an extreme, police officers could watch drunk drivers stumble to their cars and drive off, weaving across the road, without incurring section 1983 liability." *Id.* Thus, if the police had failed to arrest the driver of the car, and she later had traded places with the drunk passenger, who then

caused the accident in which plaintiffs and decedents were involved, the police would not be liable. *Id.* However, in this case, it was the police action of arresting the driver, combined with their knowledge of the passenger's intoxication, that created police liability for the subsequent accident. *Id.*

However, the court noted that if the initial driver of the car also was drunk, the police would not be liable for the accident, because police officers are not liable under section 1983 "for exchanging one drunk driver for another." *Id.* The court stated that the reason for this is simple:

> [W]ithout state intervention, the same danger would exist. The state action did not place individuals in a position of danger that they otherwise would not have faced. The [plaintiffs and decedents] are no worse off with [the initial driver] driving while intoxicated than they are with [the initial passenger] driving while intoxicated.

*Id.* at 1125–26.

Finally, the court noted that while it had been reluctant to impose section 1983 outside of the custodial setting, *see, e.g., Losinski v. County of Trempealeau,* 946 F.2d 544 (7th Cir.1991); *Archie,* 847 F.2d at 1211, it found that plaintiffs such as those in the case before it may state claims for civil rights violations if they allege state action that either creates or substantially contributes to the creation of a danger to which citizens otherwise would not be exposed, or renders citizens more vulnerable to a danger than they otherwise would have been. *Reed,* 986 F.2d at 1126. It found that while the defendants in the case before it did not create the danger by buying the passenger drinks or providing him with a car, they did take state action that rendered plaintiffs and decedents and other motorists more vulnerable to a dangerous driver. *Id.* Accordingly, the court reversed the grant of summary judgment in favor of defendants.

*See also Ross v. United States,* 910 F.2d 1422, 1430–31 (7th Cir.1990) (allegations that county cut off sources of private rescue to drowning persons without providing alternative to private rescue stated claim under section 1983); *Wood v. Ostrander,* 879 F.2d 583, 589 (9th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990) (officer who impounded car and arrested driver, but left passenger alone and on foot in a high crime area, violated passenger's substantive due process rights under Fourteenth Amendment); *Estate of Sinthasomphone v. City of Milwaukee,* 785 F.Supp. 1343, 1347–49 (E.D.Wisc.1992) (allegations that police officers actively prevented private citizens from helping a boy found badly injured and naked and delivered the boy not to his parents but to the man who eventually murdered the boy stated a section 1983 claim).

■ In light of the principles established in the foregoing cases, the court finds that the allegations in paragraphs 23 and 24 of plaintiffs' complaint challenged by defendants do not state a legally cognizable claim. *Youngberg* unequivocally holds that a state is not constitutionally required to provide any particular substantive services to its citizens. *See Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2459. Substantive services obviously include mental health care. Thus, a state is not required to provide mental health care to its citizens.

■ Moreover, if a state chooses not to provide particular services, it cannot be held liable for harm that could have been averted had the state chosen to provide the services. *DeShaney,* 489 U.S. at 197–97, 109 S.Ct. at 1003–04; *Archie,* 847 F.2d at 1211. So, if the state chooses not to provide mental health services for its citizens, it cannot be held liable for injuries to its citizens that would not have occurred had it provided mental health services.

■ Even if a state at one time provided protective services for its citizens but then discontinued the services, it is not liable for harm that comes to its citizens no longer protected. *See DeShaney,* 489 U.S. at 199–200, 109 S.Ct. at 1005. Thus, when the state discontinues mental health care for one of its citizens by discharging him or her from a state mental health facility, it is not liable for harm that comes to the former patient after discharge.

[7] However, once a state provides a "service" that results in the state's taking custody of a person, the state must responsibly carry out its service. Thus, a person in a state's custody, such as a patient of a state mental health facility, is entitled to safe conditions of confinement and freedom from unnecessary bodily restraints. *See Youngberg*, 457 U.S. at 315–16, 102 S.Ct. at 2458; *Estelle*, 429 U.S. at 103–04, 97 S.Ct. at 290–91; *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1009. *See also K.H.*, 914 F.2d at 849 (after removing child from parents' custody and thereby taking custody of child, the state could not place child in position of danger without violating child's due process rights).

■ Furthermore, a state cannot take affirmative action to harm its citizens. *See K.H.*, 914 F.2d at 849. Thus, if a state acts and thereby creates a danger to which its citizens otherwise would not be exposed or renders citizens more vulnerable to danger than they otherwise would have been, it may be liable for the harm caused by its actions. *See Reed*, 986 F.2d at 1125–26.

The allegations challenged by defendants boil down to these:

1. When the state discharges patients from its institutions, it does not put them in appropriate and adequate private facilities.

2. The state discharges patients regardless of their needs or the availability of private care.

3. The state refuses to admit patients regardless of their needs or the availability of private care.

4. The state fails to care for discharged patients.

Assuming that these allegations are true, they describe appalling conduct by the state. However, they do not describe illegal conduct. When the state discharges patients, it gives up its custody of them. At that point, the state's obligations under *Youngberg* to provide plaintiffs with safe conditions of confinement and freedom from unnecessary bodily restraints end. Moreover, simply because the state once provided plaintiffs with shelter and care does not bind it always to provide them with shelter and care. *See DeShaney*, 489 U.S. at 201, 109 S.Ct. at 1006 ("the State does not become the permanent guarantor of an individual's safety by having once offered him shelter").

In addition, because the state is not constitutionally required to provide mental health services, it cannot be held liable for refusing to admit some persons to its institutions (in the absence of a different constitutional violation, such as discriminatory refusal to admit because of race).

The court agrees as a general matter with plaintiffs that a state cannot act to create danger to its citizens or make its citizens more vulnerable to danger. However, the paragraphs of plaintiffs' complaint challenged by defendants do not allege that, by discharging its patients to inadequate facilities or to the streets, the state has created a dangerous situation that otherwise did not exist. The challenged paragraphs also do not allege that the state, through affirmative acts, made its patients more vulnerable to dangerous conditions outside the institutions. Rather, paragraphs 23 and 24 of plaintiffs' complaint allege only that the state discharges patients and does not ensure that they have adequate post-discharge care, and refuses to admit patients who do not have adequate private care alternatives. At the most, these allegations paint the state as an "inept rescuer" rather than as a "doer of harm." *K.H.*, 914 F.2d at 849 (citations omitted).

Thus, the situation presented by plaintiffs' allegations is not analogous to the cases involving dangerous conditions caused by the state. Rather, it is like the sad case of Joshua DeShaney. The state simply is not required to protect its citizens, even those formerly in its protective custody, from private harms. By discharging its patients without ensuring that they have adequate post-discharge care, or by refusing to admit some persons to its institutions, the state is not creating danger but is allowing those persons discharged or not admitted to experience the same dangers that they would have experienced had the state not acted at all.

In an effort to save the allegations challenged by defendants, plaintiffs contend that in light of *Camp v. Gregory,* 67 F.3d 1286 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2498, 135 L.Ed.2d 190 (1996), the state may be liable for harm that comes to patients who have formally become wards of the state, and thus have been deprived of the legal authority to make their own decisions. Assuming this is true, it does not change the court's analysis.

In their original complaint, plaintiffs have not alleged that those who seek relief in paragraphs 23 and 24 of the complaint are wards of the state, unable to make their own decisions and therefore at the mercy of wherever the state puts them upon discharge. Furthermore, the class that was certified almost four years ago consists of current and future patients of the state mental health facilities, without distinction between wards and non-wards of the state. The allegations in plaintiffs' complaint are made by the class as a whole. To carve out a special sub-class, to which different allegations, facts, and legal rules apply, would violate the typicality requirements of class certification, which the court discusses in greater length in section II.B. below. If plaintiffs who are wards of the state wish to press their post-discharge claims, their remedy is a new lawsuit on behalf of a different class.

Plaintiffs also argue that even if the court finds that constitutional violations occurred only within the state hospitals, the court has authority to order remedies that extend beyond the walls of the state institutions. Plaintiffs claim that *Thomas S. by Brooks v. Flaherty,* 902 F.2d 250 (4th Cir.) *cert. denied,* 498 U.S. 951, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990), in which the district court awarded injunctive relief to class members who had been released from state institutions, is indistinguishable from plaintiffs' case.

In *Thomas,* a class of mentally retarded adults held in North Carolina's psychiatric hospitals sued the state, asking for declaratory and injunctive relief in the form of constitutionally required treatment. After a bench trial, the district court found for plaintiffs and ordered the injunctive relief requested by the plaintiffs. The state appealed. *Id.* at 251.

Among other things, the state argued that the district court improperly found that the plaintiffs had a right to treatment in the least restrictive environment, and improperly required community placement for the plaintiffs. *Id.* at 253. The Court of Appeals for the Fourth Circuit disagreed. The court found that the district court did not apply a least restrictive analysis, but found that the plaintiffs had a right to "*minimally adequate* habilitation in a setting *minimally adequate* to reduce self-abuse and aggression." *Id.* (emphasis in original).

The court found that the district court's order followed *Youngberg's* teaching that the " 'minimally adequate training required by the Constitution is such training as may be reasonable in light of respondent's liberty interests in safety and freedom from unreasonable restraints.' " *Id.* at 254 (quoting *Youngberg,* 457 U.S. at 322, 102 S.Ct. at 2461). It stated that it "d[id] not interpret the [district] court's order to require community placement of all class members." *Thomas,* 902 F.2d at 254. Rather, the district court had set up a process by which the needs of the plaintiffs would be evaluated by professionals on a case-by-case basis, and the professionals might or might not find that the minimally adequate setting for habilitation for an individual plaintiff is community placement. *Id.*

The state also argued that the district court defined the class too broadly to include mentally retarded adults who were released from state institutions after the date the class was certified. The state contended that persons who were no longer in state custody had no substantive due process rights to minimally adequate treatment and thus should not be included in the district court's order. The state relied on *Youngberg* and *DeShaney* for the proposition that the state has no duty to provide services to persons not under state control. *Id.*

The court rejected the state's argument. It stated that *DeShaney* did not support the proposition that persons who were in state custody at the time of class certification and later released have no right to a remedy. *Id.*

It stated that *DeShaney* held that the due process clause does not require the state to protect a child no longer in state custody from harm caused by his father. *Id.* The court noted that the Supreme Court in *DeShaney* distinguished *Youngberg* by pointing out that the state has a duty to provide services when it restrains a person's liberty through institutionalization. *Id.* (citing *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005–06).

The court noted that all members of the class were institutionalized patients on the date the class was certified. It stated that the district court's order "sought to remedy the harm suffered by class members whether they remained in the institution or had been discharged." *Thomas*, 902 F.2d at 254. The court stated: "The object of the [district] court's order is twofold: to ameliorate the lingering effects, if any, of improper treatment; and to remedy inappropriate community placements, if any, ... that were not anticipated by professionals in the institutions." *Id.*

The court stated that it believed that "the state's duty to render the kind of treatment prescribed by *Youngberg* is not discharged by simply releasing a class member from the institution where he or she had been hospitalized. Otherwise, the state could unilaterally avoid the obligations imposed by *Youngberg* ... and defeat the claims of class members by terminating their institutional care while the case was pending." *Id.* at 254–55. The court stated that "class members who were discharged after the class was certified are entitled to the consideration due those class members who remain in the institutions." *Id.* at 255. Finally, the court noted that the district court's definition of the class was only a "practical starting point for identifying the persons needing help." *Id.* It stated that if class members had not been injured by past constitutionally inadequate treatment or were then receiving minimally adequate treatment in appropriate placements, "their present situation need not be disturbed." *Id.*

*Thomas* is distinguishable from the present case in several respects. First, the primary class claim in *Thomas* was that, under *Youngberg*, plaintiffs were entitled to minimally adequate habilitation in a setting minimally adequate to reduce self-abuse and aggression. *See id.* at 253. It was on this claim that the district court based injunctive relief. *See id.*

In the present case, however, the paragraphs of plaintiffs' complaint now challenged by defendants do not involve a claim to minimally adequate habilitation in a setting minimally adequate to protect plaintiffs' liberty interests as set forth in *Youngberg*. Other portions of plaintiffs' complaint may make this claim. However, the allegations in paragraphs 23 and 24 of plaintiffs' complaint imply that the state must place discharged patients in adequate private facilities, keep patients in state institutions if no adequate private care is available, and admit all patients who need care. (*See* Compl. ¶¶ 23, 24.) These allegations claim a class-wide right to appropriate placement and adequate care in private facilities, and put responsibility for protecting that right on the state. These allegations are a far cry from the claims in *Thomas* and *Youngberg* by patients of state mental institutions to minimally adequate habilitation in a minimally adequate setting, based on the case-by-case analysis by professionals.

Second, in the portion of the *Thomas* opinion most heavily relied upon by plaintiffs in this case, the Fourth Circuit held that the *Thomas* class consisted of all patients institutionalized in state psychiatric hospitals at the time the class was certified. *See id.* at 254–55. The court found that the state could not avoid its *Youngberg* obligations and liability in the lawsuit by discharging class members from its institutions, in an attempt effectively to shrink the class. *See id.* Thus, the court held that the district court's definition of the class, which included patients who had been discharged after class certification, was correct. The court concluded that if any class members, including discharged patients, had not suffered past injury or currently were receiving minimally adequate treatment in appropriate placements, then those class members would be left wherever they were; that is, they would not be entitled to injunctive relief. *See id.* at 255.

In the present case, the allegations of plaintiffs' complaint challenged by defendants have nothing to do with the scope of the class. This court acknowledges that persons who were in state institutions at the time the class was certified, but subsequently were released, are still considered part of the class. In fact, the three named plaintiffs are no longer institutionalized, yet they are still the named plaintiffs. (*See* section II.B. below.)

Moreover, this court believes that to the extent the court in *Thomas* discussed the rights of class members to appropriate community placements, that court was referring to the established right under *Youngberg* to minimally adequate habilitation in a setting minimally adequate to preserve plaintiffs' liberty interests in safety and freedom from unnecessary restraints. Again, those *Youngberg* rights are not at issue in paragraphs 23 and 24 of plaintiffs' complaint.

Finally, to the extent that *Thomas* is inconsistent with this court's reasoning and conclusions as set forth in this opinion, the court finds that *Thomas* also is inconsistent with the law of the Supreme Court and Seventh Circuit, particularly *Phillips*, which are binding on this court. For all of the foregoing reasons, plaintiffs' reliance on *Thomas* is misplaced.

In sum, the court agrees with plaintiffs that the state's conduct alleged in paragraphs 23 and 24 of plaintiffs' complaint is deplorable, callous, and shocking. However, the court finds that the state has no substantive due process obligation to provide any particular type of care for all of its patients once it discharges them from its custody, or to admit every patient who seeks admission to state mental health institutions. Accordingly, the court grants defendants' motion for partial judgment on the pleadings.

## B. *Plaintiffs' motion for leave to file an amended complaint*

Plaintiffs seek to amend their complaint in four respects, two of which are unopposed by defendants. First, plaintiffs seek to dismiss without prejudice the claims of class members housed in child and adolescent units and forensic units in the state's mental health facilities, and all patients at Chester Mental Health Center. Defendants do not oppose this change. The court grants plaintiffs leave to amend their complaint in this respect.

The court also orders plaintiffs to issue notice of this change in the scope of the complaint, and consequent change in the membership of the class, to members of the class in the form proposed in Exhibit 2 to plaintiffs' motion for leave to amend their complaint. Plaintiffs are to provide copies of this notice to defendants, who are to post this notice conspicuously for two months from the date of this order at the units and visiting areas of all state-operated mental health facilities that have forensic or child and adolescent patients. Plaintiffs also are to provide copies of this notice to appropriate legal and mental health advocacy groups.

Second, plaintiffs seek to amend their complaint to account for the passage of time since the complaint first was filed. Ann Patla is the current director of the Illinois Department of Mental Health and Developmental Disabilities, and the plaintiffs wish to substitute her name for that of Jess McDonald, the director named in the original complaint.

In addition, named plaintiffs K.L., L.F., and R.B. have been discharged from the state institutions in which they resided when the original complaint was filed. Plaintiffs wish to change wording in the complaint to reflect that K.L., L.F., and R.B. were, at the time the case was filed, confined to particular state institutions. Defendants appear to have no objection to this proposed amendment. The court grants plaintiffs leave to amend their complaint in this respect.

Third, plaintiffs seek to amend their complaint to allege the following:

Some of the patients discharged into inadequate privately operated facilities or to the streets have been adjudicated incompetent in State proceedings and are wards of the Office of State Guardian, and others are mentally incompetent but have never been formally so adjudicated.

(Pls.' Mot. for Leave to File Am.Compl. Ex. 1 ¶ 13.) Plaintiffs contend that this new allegation may be significant in light of defendants' motion for partial judgment on the pleadings. As the court stated in section II.A. above, the court finds that to allow plaintiffs to create a sub-class within their class and make allegations applicable only to the sub-class would defeat the typicality requirement of class actions.

In a class action, the claims or defenses of the representative parties must be typical of the claims or defenses of the class. FED.R.CIV.P. 23(a). Class representatives' claims are typical of the class if they "have the same essential characteristics as the claims of the other class members." *Patrykus v. Gomilla*, 121 F.R.D. 357, 361–62 (N.D.Ill.1988) (citing *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983)). That is, representatives' claims are typical of the class if they arise "from the same event or practice or course of conduct that gives rise to the claims of other class members and ... [are] based on the same legal theory." *Patrykus*, 121 F.R.D. at 362 (quoting H. NEWBERG, NEWBERG ON CLASS ACTIONS § 1115(b) (1st ed. 1977)).

Plaintiffs do not explicitly allege in their proposed amended complaint or argue in their briefs that the class representatives are wards of the state. The court presumes that they are not. The court made clear in its analysis of defendants' motion for partial judgment on the pleadings that as a general matter, patients discharged from state institutions or persons not admitted to state institutions have no claims against the state based on any injuries that come to them outside state institutions. The court took no position on whether patients or former patients who were wards of the state could state claims against the state for injuries that occurred to them after they were discharged from the state institutions, but acknowledged that wards of the state might be in a different legal position than regular citizens.

The allegations at issue in defendants' motion for partial judgment on the pleadings would apply, if at all, only to the sub-class that plaintiffs seek to create. Thus, the claims of the class representatives, and of most of the class members, are not typical of those claims of the proposed sub-class challenged in defendants' motion for partial judgment on the pleadings, because the proposed sub-class plaintiffs may be on different legal footing than the rest of the class.

The court finds that creating the sub-class suggested by plaintiffs within the class certified by Judge Shadur early in this case would defeat the typicality requirement. Moreover, the court notes that the class was certified long ago as all current or future residents of state mental health institutions, with no distinction between the legal status of the residents. The court will not begin drawing such distinctions now, as the case approaches its end.

Accordingly, the court denies plaintiffs' motion to amend their complaint to allege that some plaintiffs are formal wards of the state or are mentally incompetent, as set forth in paragraph 24 of the proposed amended complaint.

Fourth, plaintiffs seek to amend their complaint to allege that defendants have never proposed a budget or plan for state agencies "responsible for overseeing the care of mentally ill citizens inside and outside of state hospitals that would permit minimally adequate treatment, care and placements for even the most severely disabled patients, such as wards of the Office of State Guardian." (Pls.' Mot. for Leave to File Am. Compl. Ex. 1 ¶ 27.)

The court denies plaintiffs' motion for leave to amend paragraph 27 to the extent that it is inconsistent with the court's conclusions regarding a state's obligation to provide services to those outside of its institutions and the proposed amendment to paragraph 24 of plaintiffs' complaint.

In sum, the court denies plaintiffs leave to amend paragraph 24 of their complaint; denies plaintiffs leave to amend paragraph 27 of their complaint to the extent that the proposed amendment to paragraph 27 is inconsistent with this opinion; and grants plaintiffs leave to amend their complaint with respect to the other proposed changes.

### III. *CONCLUSION*

For the foregoing reasons, the court grants defendants' motion for partial judgment on the pleadings; grants in part and denies in part plaintiffs' motion for leave to amend their complaint; orders plaintiffs to file their amended complaint within 10 days of the date of this order; and orders plaintiffs to issue notice to class members of the changes in the complaint in accordance with this opinion. Defendants are given 10 days from the date plaintiffs file their amended complaint to file an answer or otherwise plead, if they intend to do so.